## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| REGGIE JACKSON, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| FORD MOTOR COMPANY, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Reggie Jackson ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), hereby alleges against the Defendant, Ford Motor Company ("Ford" or "Defendant"), upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, and based upon the investigation made by the undersigned counsel, as follows:

### I.      NATURE OF THE CASE

1.      Plaintiff seeks damages and equitable relief, individually and on behalf of all other Class members, for Ford's sale and lease of Class Vehicles that suffer from a structural defect in their valvetrains that makes the vehicles susceptible to catastrophic engine failure, exposing occupants to great risk of bodily harm.

2.     The Class Vehicles, as that term is used herein, are certain Ford vehicles equipped with 2.7L or 3.0L "EcoBoost" engines containing intake valves made out of "Silchrome Lite." Vehicles equipped with such engines include: the Ford Bronco (model year 2022); the Ford F-150 (model year 2021-2022); the Ford Edge (model year 2021-2022); the Lincoln Nautilus (model year 2021-2022); the Ford Explorer (model year 2021-2022); and the Lincoln Aviator (model year 2021-2022).

3.     Lurking inside the engines of the Class Vehicles are intake valves manufactured out of an alloy known as "Silchrome Lite," a material that becomes excessively hard and brittle if exposed to over-temperatures during the machining of the component.

4.     These structurally-compromised intake valves cannot withstand the pressures placed upon them and risk fracturing (the "Valvetrain Defect").

5.     When this occurs, the consequence can be sudden, catastrophic engine failure and a loss of motive power. In the aftermath of such an event, the only repair available is a full engine replacement.

6.     If the Valvetrain Defect causes catastrophic engine failure during high-velocity driving, this poses a high risk of injury not just to the driver of the vehicle, and any passengers, but also to those in the immediate surrounding area who have to contend with a speeding hunk of metal whose driver has lost control.

7. Ford stopped manufacturing valves made out of "Silchrome Lite" in October 2021, opting instead for a different, more resilient alloy that is less prone to fracture.

8. Consumers began to experience vehicle failure as a result of the Valvetrain Defect soon after purchasing their Class Vehicles.

9. As early as March 2022, consumers sent letters to the Office of Defects Investigation (ODI) at the National Highway Traffic Safety Administration (NHTSA) complaining about the defect, raising questions about the integrity of the Ford Bronco, and requesting an investigation.

10. The ODI then opened a formal investigation into the matter on July 22, 2022, after identifying 26 complaints alleging catastrophic engine failure and the sudden loss of motive power at highway speeds in affected vehicles.

11. Despite Ford's longstanding knowledge as to the discrete cause of the defect, as evidenced by its purposeful decision to alter its manufacturing processes and stop using "Silchrome Lite," Ford has yet to initiate a recall of all affected vehicles. Nor has Ford offered its customers an adequate repair or replacement of their defective valves, or compensated consumers for the diminished value caused by the Valvetrain Defect.

12. Ford's failure to implement a recall is particularly egregious, where, as here, the consequences of the defect are potentially enormous and place drivers and their passengers at an unacceptably high risk of bodily injury.

13. Each purchaser or lessee of a Class Vehicle unwittingly paid for a vehicle with an undisclosed and significant safety defect. Each of these purchasers and lessees were damaged in that they paid more for their Class Vehicles than they would have paid had they known about the Valvetrain Defect or in that they would not have purchased or leased their Class Vehicles at all had they been informed of the defect.

## II.  <u>JURISDICTION AND VENUE</u>

14. This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff and one or more of the other Class members are citizens of a different state than Defendant.

15. This Court has personal jurisdiction over Ford because it is a Michigan corporation with its corporate headquarters located in this district.

16. Additionally, Ford has purposefully availed itself of the privilege of conducting business in the State of Michigan by advertising and selling its manufactured vehicles (including the Class Vehicles) within the State's boundaries, providing another basis for personal jurisdiction.

4

17.     Venue is proper in this District under 28 U.S.C. § 1391 because Ford resides within this district and a substantial part of the events giving rise to Plaintiffs' claims occurred within this district.

### III.   PARTIES

**A.     Plaintiff**

18.     Reggie Jackson is domiciled in Tampa, Florida.

19.     Mr. Jackson owns a 2022 Ford Bronco Wildtrak equipped with a 2.7L EcoBoost engine.

20.     According to his vehicle's VIN number, it was manufactured before October 2021.

21.     He purchased his 2022 Ford Bronco new from Brandon Ford, a Ford dealership in Tampa, Florida.

22.     Prior to purchasing his 2022 Ford Bronco, Mr. Jackson saw multiple commercials for the vehicle that promoted the vehicle's reliability and durability and he also spoke with a sales representative.

23.     Mr. Jackson also relied upon the information in the Monroney sticker on the vehicle at the time of purchase. He still possesses the sticker.

24.     Ford did not disclose the Valvetrain Defect through any of these avenues.

25.    Ford failed to disclose the Valvetrain Defect to Mr. Jackson before he purchased his 2022 Ford Bronco, despite Ford's knowledge of the defect, and Mr. Jackson, therefore, purchased his vehicle with the incorrect understanding that it would be a safe and reliable vehicle.

26.    Had Ford disclosed the Valvetrain Defect, Mr. Jackson would not have purchased his vehicle, or he certainly would have paid less for it.

## B.    Defendant

27.    Defendant Ford Motor Company is a corporation organized under the laws of the State of Delaware and headquartered in Dearborn, Michigan.

28.    Ford is responsible for the manufacturing, sales, marketing, service, distribution, import, and export of the Class Vehicles. Ford is also the warrantor and distributor of Ford vehicles, including the Class Vehicles, throughout the United States.

29.    To sell vehicles to the general public, Ford enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiff. In return for the exclusive right to sell new Ford-branded vehicles, authorized dealerships are also permitted to service and repair these new vehicles under the warranties Ford provides directly to consumers. All service and repair at an authorized dealership is completed according to Ford instructions, issued through service manuals, TSBs, and other documents. Per the agreements between

Ford and the authorized dealers, consumers like Plaintiff can receive services under Ford's warranty at dealer locations that are convenient to them. These agreements provide Ford with a significant amount of control over the actions of the authorized dealerships. For example, Ford employees are appointed as managers for particular regions of the United States and their responsibilities include managing the day-to-day operations of the dealerships located within their regions.

30. Ford developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Class Vehicles. Ford is also responsible for the production and content of the information on the Monroney Stickers.

31. Ford is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Defendant. Consumers are not given a meaningful choice in the terms of the warranties provided by Defendant, and those warranties are offered on a "take it or leave it" basis.

## IV.   FACTUAL ALLEGATIONS

### A.   Nature of the Defect

32. Each of the Class Vehicles are equipped with either a 2.7L or a 3.0L EcoBoost engine containing intake valves made out of "Silchrome Lite."

33.     In simple terms, the function of an intake valve is to regulate the flow of the mixture of fuel and air that is drawn into an engine's cylinder for combustion.

34.     To perform this vital function, the valves must be able to withstand the extreme conditions of the combustion chamber.

35.     If they are not fixed promptly, broken valves can seriously damage the overall integrity of the engine and its performance.

36.     Due to a loss of compression, the engine of a vehicle with compromised intake valves will sputter and misfire when the vehicle is in motion. If the valve fully breaks apart, its component pieces can then get sucked into the combustion chamber itself, causing irreversible damage to the pistons and cylinder heads.

37.     Due to the Valvetrain Defect, the intake valves in the Class Vehicles are composed of a compromised material—"Silchrome Lite"—that cannot withstand the intense pressures foisted upon them during the regular operation of the vehicle.

38.     If not remedied immediately, these structural infirmities in the intake valves will give way to stress fractures, resulting in sudden and catastrophic engine damage.

**B.     NHTSA Investigation**

39.     In March 2022, aggrieved consumers penned a series of letters petitioning NHTSA to launch a defect investigation into Ford for problems stemming from the 2.7L EcoBoost engine.

40.     The first of these letters was dated March 17, 2022[1], the second was dated March 18, 2022[2], and the final letter was dated March 29, 2022[3].

41.     The letters each contained substantially similar allegations, namely that (1) the 2021 Ford Bronco suffered from a known defect that causes catastrophic engine failure, (2) Ford was aware of the defect as evidenced by internal documents, (3) Ford has not communicated with owners about the defect, which poses major safety issues, (4) 35 people have filed complaints about the issue on NHTSA's website, and (5) there was an urgent need for a recall to prevent serious injury.

42.     According to the author of the first letter, the Valvetrain Defect posed:

> a major safety issue in that the catastrophic engine failure has already left hundreds of people stranded on roadways nationwide. Some have barely avoided major injury when their vehicles have had complete power loss at freeway speeds in traffic, others in the middle of busy intersection with no ability to get out of harms way, and still others have been stranded for hours in freezing conditions waiting for help.

43.     The author further noted that Ford was aware of the defect:

---

[1] Exhibit 1, https://static.nhtsa.gov/complaints/11461178/11461178-0002.pdf
[2] Exhibit 2, https://static.nhtsa.gov/complaints/11460125/11460125-0002.pdf
[3] Exhibit 3, https://static.nhtsa.gov/complaints/11460124/11460124-0002.pdf

Ford needs to recall the affected units immediately for proactive replacement of the parts causing the total failure of this engine. They have clearly acknowledged the problem by stopping production and implementing a change to this engine before resuming production. In fact, an internal Ford memo documents these changes. It appears as if all 2.7L EcoBoost engines build and installed in the 2021 Ford Bronco built between May 2021 and November 2021 are affected by these failures.

44.     The author concluded his letter by pleading with federal authorities to get involved: "Please initiate an investigation into this known defect so that we may prevent serious injury or possible death."

45.     Shortly after receiving this trio of letters, on May 27, 2022, the ODI opened a Defect Petition to evaluate whether to grant or deny the petitioners' request to investigate the Ford Bronco.[4]

46.     On July 22, 2022, ODI elected to proceed and open an investigation (or "Preliminary Evaluation") into the 2021 Ford Bronco. The "Problem Description" was as follows: "Under normal driving conditions without warning the vehicle may experience a loss of motive power without restart due to the catastrophic engine failure related to an alleged fault valve within 2.7 L Eco-Boost Engines."[5]

---

[4] Exhibit 4, https://static.nhtsa.gov/odi/inv/2022/INOA-DP22001-4273.PDF
[5] Exhibit 5, https://static.nhtsa.gov/odi/inv/2022/INOA-PE22007-7888.PDF

47.     The purpose of the investigation was to "assess the scope, frequency, and potential safety-related consequences of the alleged defect."[6]

48.     The problem would prove to be worse and more widespread than originally anticipated.

49.     As ODI explained in its subsequent statement released on September 29, 2023, where it authorized a full-scale engineering analysis into the defect, ODI's preliminary evaluation had revealed that the alleged defect also affected vehicles equipped with 3.0L EcoBoost engines.[7]

50.     In other words, this defect was not limited to the 2021 Ford Bronco, as alleged in the initial petition letters, but it also affected a much wider range of models. ODI estimated the total number of affected vehicles was 708,837. [8]

51.     ODI observed the following about the root cause of the defect:

During the investigation, multiple contributing factors were identified which can lead to the fracturing of the intake valves in the subject engines. Ford acknowledged that a fractured intake valve can result in catastrophic engine failure and a loss of motive power and noted that following a valve fracture, a vehicle typically requires a full engine replacement. Ford advised ODI that the defective valves were manufactured out of a specific alloy known as "Silchrome Lite", which can become excessively hard and brittle if an over-temperature condition occurs during machining of the component…Ford has identified that the defective intake valves commonly fail early in a vehicle's life and has suggested that the majority of failures have already occurred.

---

[6] Exhibit 6, https://static.nhtsa.gov/odi/inv/2023/INOA-EA23002-10790.pdf
[7] *Id.*
[8] *Id.*

52. To date, Ford has yet to declare a recall targeting the Valvetrain Defect.

**C. Ford Is on Notice of the Defect**

53. Ford knew about the Valvetrain defect when it sold Plaintiff his vehicle. Such knowledge can be imputed from Ford's field-testing procedures, its purposeful decision to stop makings its valves out of "Silchrome Lite," and its presumed compliance with the TREAD Act, an expansive federal law that requires, among other things, for vehicle manufacturers to track vehicles' diagnoses and repairs for alleged defects in a single, aggregated database. 49 § 30166(m)(3)(A)(West).

54. Like all major vehicle manufacturers, Ford performs comprehensive field testing on its vehicles before the company releases vehicles on the consumer market. Considering that this Defect manifests early in the lifespan of the affected vehicles, standard, pre-release field testing would have alerted Ford engineers to the existence of the Valvetrain Defect. However, Ford failed to act on this knowledge. Instead of delaying the release of the Class Vehicles until its engineers could get to the bottom of the Defect, Ford instead proceeded full steam ahead with the rollout, releasing vehicles into the stream of commerce that it knew contained brittle intake valves suffering from the Defect.

55.    Ford subsequently marketed and sold these vehicles to unsuspecting consumers without disclosing the safety risk or warning to Class members. In making this series of decisions, Ford placed its own interests ahead of those of consumers.

56.    Further, Ford purposefully stopped using "Silchrome Lite" as early as October 2021. This "design modification," as explained in the ODI materials, "changed the intake valve material to a different alloy known as "Silchrome 1," that is less susceptible to over-temperature during machine grinding."[9]

57.    Ford was also put on notice about the Defect's existence from a cascade of information pouring into its dealerships from frustrated customers, who were taking their cars in for repair and complaining to Ford mechanics about sudden loss of motive power. Pursuant to its obligations under the TREAD Act, Ford had to meticulously document and aggregate these types of consumer-driven field reports and the accompanying warranty data they produced. Indeed, Ford, like any major vehicle manufacturer, likely has compliance officers whose entire job is to make sure the company complies with its "early warning" reporting obligations under the TREAD Act. [10]

---

[9] *Id.*

[10] Of the major American car manufacturers, Ford is perhaps uniquely aware of the duties imposed upon it by the TREAD Act. Ford was responsible for the passage of the TREAD Act. Congress passed the sweeping law in 2000 largely in response to anger at Ford's failure to notify NHTSA of numerous tire-related safety campaigns

58.    In addition to the warranty data produced by customers bringing in their defective vehicles for repair, Ford was also put on notice about the Defect through NHTSA complaints.

59.    As ODI noted in its statement on July 22, 2022, when it opened a preliminary investigation into the 2021 Ford Bronco, numerous complaints were posted to NHTSA.gov documenting the Valvetrain Defect.[11]

60.    For every complaint that a consumer files with NHTSA, a car manufacturer likely receives hundreds, or even thousands, of related warranty claims.[12]

61.    Through monitoring warranty data and NHTSA activity—which is required to be in full compliance with the TREAD Act—Ford knew, or should

---

conducted in overseas markets related to the Ford Explorer. *See* Kevin M. McDonald, *Don't Tread on Me: Faster Than A Tire Blowout, Congress Passes Wide-Sweeping Legislation That Treads on the Thirty-Five Year Old Motor Vehicle Safety Act*, 49 Buff. L. Rev. 1163, 1163 (2001).

[11] Ex. 5, https://static.nhtsa.gov/odi/inv/2022/INOA-PE22007-7888.PDF. ODI specifically referenced the following NHTSA complaints: 11448171, 11448461, 11450659, 11450702, 11450737, 11450788, 11450871, 11450879, 11451158, 11451503, 11451957, 11452074, 11452692, 11453669, 11453933, 11454098, 11455294, 11456219, 11456713, 11459262,11460124, 11460125, 11461178, 11463199, 11463296, and 11464516.

[12] For comparison, in a different case—this one involving Honda—Honda, as is mandated by federal regulations, prepared a section 573.6(b)(6) report for NHTSA detailing the history of its investigation into a potential defect. *See* https://static.nhtsa.gov/odi/rcl/2017/RMISC-17V418-5009.pdf. In that report, Honda noted that a potential defect involving a "thermal event" was suspected in some 3,826 warranty claims, even though "zero field reports" were reported.

have known, of the Defect soon after the rollout of the 2020 Ford Explorer, well before it sold a defective vehicle to Plaintiff.

62.     The Valvetrain Defect, by stripping vehicles of their motive power—a catastrophic failure that can occur at any moment, including during highway driving—poses an unreasonable safety hazard.

63.     This defect is not the equivalent of a broken CD player; it is a problem that makes these Class Vehicles fundamentally unfit to drive unless and until the faulty, brittle valves are replaced.

64.     Discovery will show that Ford unlawfully failed to disclose the Defect to induce Plaintiff and other Class Members to purchase or lease the Class Vehicles.

65.     Defendant engaged in deceptive acts or practices in Plaintiff's and Class Members' purchases or leases of Class Vehicles.

66.     Plaintiff and the Class paid more money for their vehicles than they would have had they been adequately informed about the Valvetrain Defect.

67.     Defendant unlawfully induced Plaintiff and Class Members to purchase or lease their Class Vehicles by concealing a material fact (the Defect), and Plaintiff and Class Members would have paid less for the Class Vehicle, or not purchased it at all, had they known of the Defect.

68.     To sell vehicles to the general public, Ford enters into agreements with its networks of authorized dealerships to engage in retail sales with consumers such as Plaintiff, while also advertising the warranties it provides directly to consumers when they purchase a Ford-branded vehicle from the authorized dealership.

69.     These agreements specifically authorize the dealerships to act in Ford's stead to provide repairs under Ford warranties. Accordingly, discovery will show, particularly through the dealership agreements between Defendant Ford and third-party dealerships, that Defendant Ford has authorized these dealerships to be its agents for the purposes of warranty repairs to provide warranty repairs on its behalf, including diagnosis of whether warranty repairs are required. As such, the consumers are third-party beneficiaries of these dealership agreements because they benefit from being able to purchase vehicles and receive warranty repairs locally. Discovery will show that because Plaintiff and Class Members are third-party beneficiaries of the dealership agreement—which creates an implied warranty of merchantability of the goods being sold by these authorized dealerships—they may avail themselves of the implied warranty against Defendant.

70.     Plaintiff and each of the Class Members are the intended beneficiaries of the express and implied warranties that accompany each Class Vehicle. The

dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Ford. These warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

71.    Ford issued the express warranty to Plaintiff and the Class Members. Ford also developed and disseminated the owner's manuals and warranty booklets that direct consumers to take their vehicles to authorized dealerships for diagnosis and repair. Ford also developed and disseminated the advertisements, such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles, which promoted the terms of the warranties that they issue with the sale of each Class Vehicle. Ford is also responsible for the content of the Monroney Stickers on its vehicles. Because Ford issues the express warranties directly to consumers, Plaintiff and Class Members are in direct privity with Ford with respect to the warranties.

72.    In promoting, selling, and repairing their defective vehicles, Defendant authorizes dealerships to provide repairs that are the responsibility of Ford to provide under Ford's warranties. Ford fulfills its responsibilities under the warranties by, among other things, requiring the following:

(a) The authorized dealerships complete all service and repair according to instructions disseminated directly to them by Ford, including service manuals, TSBs, SSMs, and other documents drafted by Ford;

(b) Technicians at the dealerships are required to attend Ford trainings yearly in order to remain certified to work on Ford vehicles, at which they receive training on proprietary systems and are provided step-by-step instructions on diagnosing and repairing Ford vehicles;

(c) Consumers are able to receive services under Ford's NVLW only at authorized dealerships, and they are able to receive these services because of the agreements between Ford and the authorized dealers;

(d) The warranties provided by Ford for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e) Ford manages the way dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Ford's authorization;

(f) Ford has entered into agreements and understandings with their authorized dealers pursuant to which they manage the dealers' interaction with the public, including the advertising of the Class Vehicles, the terms and conditions of the express warranties, and the terms under which

consumers may avail themselves of the remedies under those express warranties; and

(g) Ford implemented its express and implied warranties as they relate to the Defect alleged herein by instructing authorized Ford dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs and the Recall cited herein.

(h) Indeed, the Ford warranty booklet makes it abundantly clear that only its authorized dealerships can provide warranty service. The booklets, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, their Ford vehicle must be "taken to a Ford dealership for a warranted repair during the warranty period." (Ford Warranty).

73.    Had Ford disclosed the Valvetrain Defect, Plaintiff and the other Class members would not have purchased their Class vehicles, or would have paid less for them. Simply put, Plaintiff and the other class members did not get what they paid for.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

**A.     Discovery Rule Tolling**

74.     Plaintiff and the other Class members could not have discovered through the exercise of reasonable diligence that their Class Vehicle were defective within the time period of any applicable statutes of limitation.

75.     Neither Plaintiff nor the other Class members knew or could have known of the Valvetrain Defect in their Class Vehicles, at least until after the ODI Report was publicly issued.

**B.     Fraudulent Concealment Tolling**

76.     Throughout the time period relevant to this action, Ford concealed from and failed to disclose to Plaintiff and the other Class members vital information about the Valvetrain Defect described herein.

77.     Indeed, Ford kept Plaintiff and the other Class members ignorant of vital information essential to the pursuit of their claims.  As a result, neither Plaintiff nor the other Class members could have discovered the defect, even upon reasonable exercise of diligence.

78.     Specifically, since at least October 2021, when it altered its manufacturing processes and stopped using "Silchrome Lite," Ford has been aware about the Valvetrain Defect.

79.     Despite its knowledge of the defect, Ford failed to disclose and concealed this critical information from Plaintiff and the other Class members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

80.     Plaintiff and the other Class members justifiably relied on Ford to disclose the Valvetrain Defect in the Class Vehicles that they purchased or leased, because that defect was hidden and not discoverable through reasonable efforts by Plaintiff and the other Class members.

81.     Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiff and the other Class members have sustained as a result of the defect, by virtue of the fraudulent concealment doctrine.

## C.     Estoppel

82.     Ford was under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the Class Vehicles.

83.     Ford knowingly concealed the true nature, quality, and character of the Class Vehicles.

84.     Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VI.   CLASS ACTION ALLEGATIONS

85.   Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

86.   Plaintiff seeks to represent the following Classes:

*All persons who purchased or leased a Class Vehicle (as defined herein) that was purchased or leased in the United States (the "Nationwide Class").*

*All persons who purchased or leased a Class Vehicle (as defined herein) that was purchased or leased in the State of Florida (the "Florida Class").*

87.   Excluded from the Classes is the Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.

88.   Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

89.   This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

90.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**   The members of the Class are so numerous and geographically dispersed that individual

joinder of all class members is impracticable.  While Plaintiff is informed and believes that there are thousands of Class members, the precise number of Class members is unknown to Plaintiff, but may be ascertained from Ford's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

91.  **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**.  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.  whether Ford engaged in the conduct alleged herein;

b.  whether Ford's alleged conduct violates applicable law;

c.  whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d.  whether Ford misled Class members about the quality of the Class Vehicles;

e.  whether the Class Vehicle contain the Valvetrain Defect;

f.  whether Ford had actual or imputed knowledge about the alleged defect but failed to disclose it to Plaintiff and the other Class members;

g.  whether Ford's omissions and concealment regarding the quality of the Class Vehicles were deceptive in violation of the consumer protection laws of Florida;

h.  whether Ford breached its express warranty to the Class members with respect to the Class Vehicles;

i.  whether Class members overpaid for their Class Vehicles as a result of the defect alleged herein;

j.  whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

k.  the amount and nature of relief to be awarded to Plaintiff and the other Class members.

92.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the other Class members purchased or leased Class Vehicles.  Neither Plaintiff nor the other Class members would have purchased the Class Vehicles, or would have paid less for the Class Vehicles, had they known of the Valvetrain Defect in the Class

Vehicles.  Plaintiff and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Ford engaged.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

93.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class that he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

94.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Ford has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

95.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other

financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the Class members to individually seek redress for Ford's wrongful conduct.  Even if the Class members could afford litigation the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.  CLAIMS FOR RELIEF
### COUNT 1
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301, *et seq.*

96.    Plaintiff repeats and realleges paragraphs 1-95 as if fully set forth herein.

97.    Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

98.    This Court has jurisdiction to decide these claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

99.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

100.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

101.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

102.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

103.   In its warranty, Ford expressly warranted that it would repair or replace any part that is defective in material or workmanship under normal use.

104.   The Ford Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

105.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of the Ford Warranty became part of the basis of the bargain between Ford, on the one hand, and Plaintiff and each of the other Class members, on the other.

106.   Ford breached this warranty as described in more detail above.

107.   At the time of sale or lease of each Class Vehicle, Ford knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any

informal settlement procedure would be inadequate, and any requirement that Plaintiff and the other Class members resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

108. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims involved in this lawsuit.

109. As a direct and proximate result of Ford's breaches of its Warranty and the implied warranty of merchantability, Plaintiff and the other Class members have sustained damages in an amount to be determined at trial.

110. Plaintiff, individually and on behalf of all the other Class members, seeks all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT 2
## VIOLATIONS OF THE FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
### Fla. Stat. §§ 501.201, *et seq.*

111. Plaintiff repeats and realleges paragraphs 1-95, as if fully set forth herein.

112. Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class" for purposes of this claim).

113.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

114.   By the conduct described in detail above and incorporated herein, Ford engaged in unfair or deceptive acts in violation of FDUTPA

115.   Ford's omissions regarding the Valvetrain Defect, described above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) a Class Vehicle.

116.   Ford's omissions regarding the Valvetrain Defect were likely to deceive a consumer acting reasonably in the same circumstances as Plaintiff and the other Class members.

117.   Ford intended for Plaintiff and the other Class members to rely on Ford's omissions of fact regarding the Valvetrain Defect.

118.   Plaintiff and the other Class members justifiably acted or relied to their detriment upon Ford's omissions of fact concerning the above-described Valvetrain Defect, as evidenced by Plaintiff's and the other Class members' purchase of their vehicles.

119.   Had Ford disclosed all material information regarding the Valvetrain Defect to Plaintiff and the other Class members, then they would not have purchased or leased the vehicle or would have paid less to do so.

120.   Ford's omissions deceived Plaintiff and the other Class members.

121.   Ford acted willfully in concealing, and not disclosing, the Valvetrain Defect from Plaintiff and the other Class members.

122.   Ford's deceptive omissions constitute an independent tort, separate of the breach of warranties alleged herein.

123.   Plaintiff and the other Class members suffered ascertainable loss and actual damages as a direct result of Ford's concealment of and failure to disclose the Valvetrain Defect.

124.   Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have done so, or would have paid significantly less, if the true nature of the Class Vehicles had been disclosed.

125.   Ford's violations present a continuing risk to Plaintiff and the Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

126.   Plaintiff and the Class seek an award of compensatory damages, punitive damages, reasonable attorneys' fees pursuant to Florida Statute section

501.201 et seq., costs, interest and any other just and proper relief available under FDUTPA.

**COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**Fla. Stat. §§ 672.313 and 680.21**

127.   Plaintiff repeats and realleges paragraphs 1-95, as if fully set forth herein.

128.   Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class").

129.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. § 672.104 and is a "seller" of motor vehicles under § 672.103.

130.   With respect to leases, Ford is and was all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031.

131.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. § 672. 105 and § 680.1031.

132.   In its warranty, Ford expressly warranted that it would repair or replace any part that is defective in material or workmanship under normal use.

133.   The Ford Warranty further states that all repairs/replacements made under the warranty are free of charge.

134.   Ford's Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles with the Valvetrain Defect.

135.   Ford breached the express warranty to repair parts defective in material or workmanship by failing to repair the Valvetrain Defect.

136.   Ford has not repaired, and has been unable to repair, the Valvetrain Defect in Plaintiff's Class Vehicle or the Class Vehicles of the other Class members.

137.   Ford was provided notice of the Valvetrain Defect through numerous complaints filed against it directly and through its dealers.

138.   Notice can be further imputed from Ford's decision to alter its manufacturing processes.

139.   The Ford Warranty therefore fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and the other Class members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

140.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair/replacement, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

141.   Also, as alleged in more detail herein, at the time that Ford warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Ford improperly concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

142.   Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Ford's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

143.   As a direct and proximate result of Ford's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 4
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### Fla. Stat. §§ 672.101, *et seq.*

144.   Plaintiff repeats and realleges paragraphs 1-95, as if fully set forth herein.

145.   Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class").

146.   Ford is a merchant with respect to the Class Vehicles, as that term is used in Fla. Stat. § 672.104.

147.   The Class Vehicles are goods as that term is used in Fla. Stat. § 672.105.

148.   Plaintiff and Class members are buyers as that term is used in Fla. Stat. § 672.103, and Ford is a seller as that term is used in Fla. Stat. § 672.103.

149.   Plaintiff purchased his Class Vehicle from Ford and an implied warranty that the goods were merchantable arose by operation of law as part of the sale.

150.   There is privity because Plaintiff and the other Class members' dealerships were agents of Ford. Namely, upon information and belief, Ford controlled the marketing and sale of the Class Vehicles, Ford controlled any dealership incentives which may have been available, the dealership executed the purchase agreement on behalf of Ford, and the dealership bound Ford to contractual obligations with the sale of the Class Vehicles.

151.   Ford breached the implied warranty of merchantability in that the goods were not in a merchantable condition when sold or any time thereafter and

were not fit for the ordinary purposes for which such goods were used, as further alleged herein.

152.   Ford has actual knowledge of the Valvetrain Defect as alleged herein, satisfying any notice requirement. Moreover, due to Ford's failure to remedy the Defect, any notice requirement is futile.

153.   The Ford Warranty fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiff and the other Class members whole and because Ford has failed and/or has refused to adequately provide the promised remedies within a reasonable time. Accordingly, the implied warranty of merchantability is not limited to the limited warranty period.

154.   As a direct and proximate result of the Valvetrain Defect, Plaintiff has not appreciated the benefit of his bargain and has suffered actual damages, as well as incidental and consequential damages, in an amount to be determined at trial.

**COUNT 5**
**FRAUDULENT CONCEALMENT/OMISSION**

155.   Plaintiff repeats and realleges paragraphs 1-95, as if fully set forth herein.

156.   Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class").

157.   Ford was aware of the Valvetrain Defect when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

158.   Having been aware of the Valvetrain Defect and having known that Plaintiff and the other Class members could not have reasonably been expected to know of this defect, Ford had a duty to disclose the Valvetrain Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

159.   Further, Ford had a duty to disclose the Valvetrain Defect because disclosure of the Valvetrain Defect was necessary to dispel misleading impressions about the Class Vehicles' safety that were or might have been created by partial representation of the facts.  Specifically, Ford promoted, through its advertisements available to all Class members, that the vehicles were safe and dependable.  Ford also disclosed information concerning the Class Vehicles in window stickers associated with the Class Vehicles, without disclosing that these vehicles contained the Valvetrain Defect.

160.   Ford did not disclose the Valvetrain Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

161.   For the reasons set forth above, the Valvetrain Defect comprises material information with respect to the sale or lease of the Class Vehicles.

162.   In purchasing or leasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on Ford to disclose known material defects with respect to the Class Vehicles.  Had Plaintiff and the other Class members known of the Valvetrain Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

163.   Ford's deceptive omissions constitute an independent tort, separate of the breach of warranties alleged herein.

164.   Through its omissions regarding the Valvetrain Defect within the Class Vehicles, Ford intended to induce, and did induce, Plaintiff and the other Class members to purchase or lease a Class Vehicle that they otherwise would not have purchased, or to pay more for a Class Vehicle than they otherwise would have paid.

165.   As a direct and proximate result of Ford's omissions, Plaintiff and the other Class members either paid too much for the Class Vehicles or would not have purchased the Class Vehicles if the Valvetrain Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 6**
**UNJUST ENRICHMENT**

166.   Plaintiff repeats and realleges paragraphs 1-95, as if fully set forth herein.

167.    Plaintiff brings this Count individually and on behalf of the other members of the Florida Class (the "Class").

168.    Ford has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Ford's concealment of the Valvetrain Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

169.    Ford has received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

170.    It is inequitable and unconscionable for Ford to retain these benefits.

171.    Because Ford concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Ford's misconduct.

172.    Ford knowingly accepted the unjust benefits of its wrongful conduct.

173.    As a result of Ford's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment in his favor and against Defendant, Ford Motor Company, as follows:

1. Declaring that this action is a proper class action, certifying the Florida and Nationwide Classes as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

2. Ordering Ford to pay actual and statutory damages (including punitive damages) and restitution by way of judgment to Plaintiff and the other Class members, as allowable by law;

3. Ordering Ford to pay both pre- and post-judgment interest on any amounts awarded;

4. Ordering Ford to pay attorneys' fees and costs of suit; and

5. Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

DATED:  October 10, 2023                 Respectfully submitted,

_/s/ E. Powell Miller_
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM**
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone:  248-841-2200
epm@millerlawpc.com
dal@millerlawpc.com

Adam J. Levitt
John E. Tangren
Daniel R. Ferri

**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
dferri@dicellolevitt.com

Anthony J. Garcia
**AG LAW, P.A.**
3602 West Euclid Avenue
Tampa, Florida 33629
Telephone:  813-259-9555
anthony@aglawinc.com

***Counsel for Plaintiff and the
Proposed Classes***